# UNITED STATES BANKRUPTCY COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

In re:                                          Case No. 3:09-bk-7291-PMG

Jon Philip Monson, II,

                Debtor.                  Chapter 7

Alfred Galaz,

                Plaintiff,

vs.                                             Adv. No. 3:09-ap-614-PMG

Jon Philip Monson, II,

                Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION

**THIS CASE** came before the Court for a final evidentiary hearing in this adversary proceeding.

In 2007, the Debtor entered into a Letter Agreement with Segundo Suenos, LLC (Segundo) for the start-up and operation of an internet center (the Center). The Center was funded with a loan from Segundo to the Debtor in the amount of $130,000.00, and the Center opened for business in February of 2008. Approximately two months later, in April of 2008, the Sheriff's Department closed the Center and seized its assets. The assets ultimately were returned to the Debtor pursuant to a settlement with the Sheriff's Office.

1

In his Second Amended Complaint, the Plaintiff asserts that the debt arising from the loan is nondischargeable in the Debtor's Chapter 7 case pursuant to §523(a)(2), §523(a)(4), and §523(a)(6) of the Bankruptcy Code.

A fundamental purpose of the Bankruptcy Code is to afford financial relief to honest but unfortunate debtors. The exceptions to discharge provided by §523(a), however, are intended to prevent a debtor from avoiding the consequences of his wrongful conduct by filing a bankruptcy case.

In this case, the debt owed to the Plaintiff is not nondischargeable under §523(a)(2) for fraud, because the evidence does not show that the Debtor intended to deceive Segundo at the time that he obtained the loan. Further, the debt is not nondischargeable under §523(a)(4) for embezzlement, because the evidence does not show that the Debtor appropriated property of Segundo with fraudulent intent.

The debt is nondischargeable under §523(a)(6) for "willful and malicious injury," however, because the evidence establishes that the Debtor knew that he damaged the Plaintiff's right to recover the loan when he removed the Center's equipment to another county and used it in a new business without Segundo's knowledge or permission.

**Background**

On October 11, 2007, the Debtor signed a Letter Agreement with Segundo Suenos, LLC (Segundo). (Plaintiff's Exhibit 6). The Agreement addressed the "material deal points" for the "funding, creation and management of an internet center (the 'Center'), which Center will be substantially relying on the use of sweepstakes participation in order to market its business." The Agreement included the following provisions:

2

> Your [the Debtor's] intent is to form a limited liability company, under the name "Internet Depot, LLC", in which you are the sole member (i.e., owner). . . . You will personally manage all aspects of the Center, and do so on a full-time basis at the Center's location, unless and until we agree otherwise.
>
> Segundo Suenos, LLC will loan you [the Debtor] the startup costs for the Center. To this end, Segundo Suenos will wire transfer to a bank account held in the name of Internet Depot LLC the sum of $130,000. . . .
>
> In consideration for this loan, Segundo Suenos will receive forty-percent (40%) of the profit from operation of the Center, and you will receive sixty-percent (60%) of the profit of the Center, following recoupment by Segundo Suenos of the loan made by Segundo Suenos in connection herein. . . .
>
> In the event that the Center is not profitable, or the parties otherwise agree to terminate its functioning, all material assets will be liquidated and first used to pay back any unrecouped portion of the loan made herein. In connection therewith, and in order to protect Segundo Suenos' investment from potential creditors of you or Internet Depot LLC, Segundo Suenos will be entitled to file with appropriate governmental agencies any documents necessary to preserve a lien upon all equipment, fixtures, and assets of the Center, and you shall agree to execute all documents presented to you in order to establish a lien upon such equipment, fixtures, and assets of the Center, and preserve Segundo Suenos' priority of claim thereon. . . .

(Plaintiff's Exhibit 6). On October 18, 2007, Segundo transferred the sum of $130,000.00 pursuant to the Agreement.

The Debtor formed Internet Depot, LLC as a limited liability company, and a site was located in Hillsborough County for the operation of the Center. (Plaintiff's Exhibit 2; Defendant's Exhibit 40). According to the Debtor, the site required a complete renovation to accommodate the Center, and the build-out occurred over a four-month period at a cost of approximately $30,000.00. (Transcript, pp. 224-25, 256-57). Additionally, a number of computers were purchased for the Center, and Internet Depot, LLC contracted with a provider for the software programs to use in the Center's sweepstakes games. (Defendant's Exhibit 38).

The Center opened for business on or about February 19, 2008. (Transcript, pp. 225, 232).

3

On April 21, 2008, the Center was raided by the Hillsborough County Sheriff's Department, and virtually all of the Center's equipment and assets were seized by the Sheriff. (Defendant's Exhibit 30; Transcript, pp. 49, 233).

In August of 2008, Segundo wrote a letter to the Debtor claiming that the Debtor had defaulted under the terms of the Letter Agreement, and stating in part:

> For the foregoing reasons, Segundo Suenos hereby demands that all material assets of the Center be liquidated at this time in order to pay back the unrecouped portion of the loan made to you, i.e., $130,000, and Segundo Suenos hereby notifies you of its desire to immediately terminate its interest in the Center.

(Plaintiff's Exhibit 35). The Debtor received the letter in late August or early September of 2008. (Plaintiff's Exhibit 35; Transcript, p. 250).

On September 12, 2008, the Debtor entered into an agreement with the Hillsborough County Sheriff's Office in which the Sheriff discharged its claims against the Debtor, and the Debtor retrieved the equipment seized from the Center under the conditions contained in the settlement. (Plaintiff's Exhibit 39; Debtor's Exhibit 4; Transcript, p. 237).

On October 28, 2008, Southern Investments of Jacksonville, LLC (Southern) was formed as a Florida limited liability company. (Plaintiff's Exhibit 44). According to Monson, he and an individual known as Matthew Baum formed Southern for the purpose of opening an internet café in Jacksonville. (Transcript, p. 260). A building was located for the café, the building was retrofitted, and the business opened in February of 2009 using equipment that previously had been used by Internet Depot. (Transcript, pp. 261-62).

In early 2009, Segundo filed an action against the Debtor in a Texas state court. (Plaintiff's Exhibit 55; Transcript, p. 80). On June 16, 2009, the Debtor and Segundo agreed in the Texas action

4

that the Debtor would produce or account for the equipment used in the Center by July 30, 2009. (Plaintiff's Exhibit 58).

The equipment was not produced by July 30, 2009, although the Debtor communicated with Segundo's attorney in late July and early August. (Plaintiff's Exhibits 60, 61; Transcript, pp. 84-85).

On August 31, 2009, the Debtor filed a petition under Chapter 7 of the Bankruptcy Code.

## Discussion

On December 4, 2009, Segundo commenced this action by filing a Complaint to determine the dischargeability of the debt owed by the Debtor under the Letter Agreement. On June 2, 2011, Raul Galaz and Alfred Galaz were substituted for Segundo as the plaintiffs in the action. (Doc. 39). On July 27, 2012, the Court entered an Order determining that Raul Galaz no longer had a personal stake in the outcome of the proceeding, but permitting the action to continue with Alfred Galaz as the Plaintiff. (Doc. 161).

In his Second Amended Complaint, the Plaintiff contends that Segundo loaned $130,000.00 to the Debtor pursuant to the Letter Agreement dated October 11, 2007, and that the debt is not dischargeable in the Debtor's Chapter 7 case pursuant to §523(a)(2), §523(a)(4), and §523(a)(6) of the Bankruptcy Code.

A fundamental purpose of the Bankruptcy Code is to afford financial relief to honest but unfortunate debtors. In re Goodwich, 517 B.R. 572, 582-83 (Bankr. D. Md. 2014). Section 523(a) provides certain exceptions to discharge, however, that are intended to prevent a debtor from avoiding the consequences of his wrongful conduct by filing a bankruptcy case. In re Ellison, 296 B.R. 266, 271-72 (4th Cir. 2002)(quoting In re Magpusao, 265 B.R. 492, 496 (Bankr. M.D. Fla. 2001)).

5

A creditor objecting to the dischargeability of a debt under §523(a) bears the burden of proof, and must establish the nondischargeability of the debt by a preponderance of the evidence. In re Bayer, 2014 WL 6778603, at 4 (Bankr. E.D. Pa.).

### A. Section 523(a)(2)(A)

Count I of the Second Amended Complaint is based on §523(a)(2) of the Bankruptcy Code. Section 523(a)(2)(A) provides:

**11 U.S.C. §523. Exceptions to discharge**

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. §523(a)(2)(A). To establish a claim under §523(a)(2)(A), a creditor generally must show the traditional elements of common law fraud: (1) the debtor made a false representation with the intent to deceive the creditor; (2) the debtor knew that the representation was false at the time that it was made; (3) the creditor relied on the misrepresentation; (4) the reliance was justified; and (5) the creditor sustained a loss as a result of the misrepresentation. In re Ortiz, 2014 WL 4589868, at 3 (Bankr. N.D. Ga.); In re Chamblee, 510 B.R. 370, 378 (Bankr. N.D. Ala. 2014).

In this case, the Plaintiff contends that the Debtor obtained the loan from Segundo by false pretenses, false representations, or actual fraud "as demonstrated by MONSON's gross failure to

6

comply with the material terms of the Letter Agreement, and absconding with the Internet Center Assets." (Doc. 257, p. 2).

Essentially, the Plaintiff contends that the Debtor did not intend to comply with the terms of the loan at the time that he signed the Letter Agreement and accepted the start-up funds. "In a matter involving an unfulfilled promise, proof of fraud requires the creditor to show that at the time the promise was made, the debtor either knew that he could not fulfill the promise or had no intention of fulfilling the promise." In re Mansour, 2005 WL 1411912, at 4 (Bankr. S.D. Fla. 2005).

In this case, the evidence does not establish that the Debtor intended to deceive Segundo at the time that he signed the Letter Agreement and obtained the loan.

First, the evidence shows that the Debtor performed a number of his obligations under the Letter Agreement. Pursuant to the Agreement, for example, the Debtor agreed to "personally manage all aspects of the Center" on a full-time basis. (Plaintiff's Exhibit 6). The Debtor was physically located in Florida during the preliminary work for the Center.

During this period, the Debtor oversaw the renovation of the Center's site in Hillsborough County, and acquired the computer equipment and other assets for use in the Center. According to the Debtor, the start-up work that he performed or managed included the tenant build-out, the installation of camera and alarm systems, the hiring of employees, the connection of utilities and telephones, and the completion of applicable insurance, bonding, and permitting processes. The Debtor testified that the construction of the Center's site was extensive and took longer than projected, but that he performed the necessary work and the Center opened for business in February of 2008. (Transcript, pp. 224-29).

Second, the evidence does not establish that the Debtor withheld the Center's financial information from Segundo after he obtained the loan proceeds. Raul Galaz (Galaz) testified that the Debtor did not provide any financial information to Segundo for six months after the loan was funded. (Transcript, pp. 44-46). According to Galaz, Segundo repeatedly requested the Center's records during this period, but did not receive any written response from the Debtor. (Plaintiff's Exhibits 10, 14, 15).

The Debtor, on the other hand, testified that Raul Galaz, as Segundo's representative, had traveled to Florida and was present with him at the bank when the Center's account was opened, and that Galaz had access to the account and the "same information" about the account that the Debtor had "from day one." (Transcript, pp. 232-33, 287-88). In addition to Segundo's access to the Center's bank account, the Debtor also testified that he and Galaz talked daily about the Center's start-up operations and finances. (Transcript, pp. 287-88).

The evidence is in conflict regarding whether the Debtor complied with his obligation under the Letter Agreement to furnish the Center's accounting records to Segundo. Consequently, the Court cannot find that the Debtor failed to disclose the Center's financial information to Segundo from the inception of the Agreement.

Third, the evidence does not establish that the Debtor took unauthorized draws from the loan proceeds in the period immediately after the loan was funded. The Letter Agreement provided:

> Notwithstanding the foregoing, we have agreed that until such time as the Center is fully profitable, i.e., the aforementioned loan has been fully recouped, an amount shall be deducted and paid to you from the revenues received in order to cover your reasonable living expenses that you are not able to cover from your own resources, for a maximum of eight (8) weeks during build out, which amounts shall be debited against your equity share.

8

(Plaintiff's Exhibit 6). Galaz testified that the Debtor violated the Agreement by paying himself a salary of $1,000.00 per week between the funding of the loan and the time that the Center was closed by the Sheriff's Department. (Transcript, pp. 53-54). The Debtor acknowledged that the Agreement did not authorize him to receive a salary during this period. The Debtor testified, however, that the Agreement with Segundo permitted him to receive "whatever I needed to survive" in the form of living expenses during the start-up phase of the Center, on the condition that the amount drawn would reduce his "equity share." (Transcript, pp. 226, 297, 302-03).

The evidence is in conflict regarding the extent to which the parties' written and verbal agreements permitted the Debtor to spend the Center's funds for personal uses. Consequently, the Court cannot find that the Debtor took unauthorized draws from the loan proceeds shortly after the loan was funded.

Finally, the evidence does not establish that the Debtor violated the Letter Agreement by refusing to sign any documents necessary to perfect Segundo's interest in the Center's equipment. (See Plaintiff's Exhibit 6). On January 16, 2008, Galaz requested the identifying information for the equipment so that a financing statement could be prepared, and the Debtor responded that he did not have all of the equipment yet. (Plaintiff's Exhibit 10). On February 18, 2008, Segundo filed a Financing Statement with the Florida Secured Transaction Registry. The Financing Statement covered "any and all equipment utilized in connection with any business established by Internet Depot LLC." (Plaintiff's Exhibit 13).

The Debtor testified that he did not see the financing statement until after the Center was closed in April of 2008. (Transcript, pp. 245, 254). He also testified that Galaz sent a Subordination and Lien Agreement to his attorney after the Center was closed by the Sheriff's Department. According to the

9

Debtor, however, he understood that he could not sign the document while criminal charges were pending against him. (Plaintiff's Exhibit 24; Transcript, p. 249).

The evidence is in conflict regarding whether the Debtor failed to provide the equipment's identifying information to Segundo, and whether Segundo presented security documents to the Debtor for execution before the Center closed. Consequently, the Court cannot find that the Debtor violated the Letter Agreement by refusing to sign any documents necessary to perfect Segundo's interest in the Center's equipment.

In summary, the evidence does not establish that the Debtor intended to deceive the Plaintiff at the time that he signed the Letter Agreement and obtained the loan proceeds. The record shows that the Debtor performed a number of his management obligations under the Letter Agreement, and that the Center opened for business four months after the Letter Agreement was signed.

The evidence does not establish, however, that the Debtor withheld the Center's financial information from Segundo, that he took unauthorized draws from the loan proceeds, or that the refused to sign the documents necessary to perfect Segundo's interest in the Center's equipment. Consequently, the evidence does not establish that the debt owed to the Plaintiff is nondischargeable as a debt for fraud pursuant to §523(a)(2)(A) of the Bankruptcy Code.

### B. Section 523(a)(4)

Count II of the Second Amended Complaint is based on §523(a)(4) of the Bankruptcy Code. Section 523(a)(4) provides:

**11 U.S.C. §523. Exceptions to discharge**

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . .

>    (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

11 U.S.C. §523(a)(4). The issue in this case is whether the Debtor embezzled Segundo's property. (Doc. 221, Order on Motion for Partial Summary Judgment).

"Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." In re Hopkins, 469 B.R 319, 323 (Bankr. W.D. Mo. 2012). To prevail on a claim of embezzlement, a plaintiff is required to show that the debtor appropriated the property with fraudulent intent, and that the property was the plaintiff's property. "A key element of . . . embezzlement is that the plaintiff must establish ownership of the property taken." In re Cuenant, 339 B.R. 262, 277 (Bankr. M.D. Fla. 2006); In re Britt, 200 B.R. 409, 411 (Bankr. M.D. Fla. 1996).

In this case, the Plaintiff contends that the Debtor embezzled Segundo's property by converting the Center's assets after the Letter Agreement was terminated. (Doc. 257, p. 2).

The evidence does not establish that the Debtor appropriated property belonging to Segundo with fraudulent intent.

The Debtor believed that the Center's equipment had been purchased by Internet Depot, LLC, and was owned by Internet Depot, LLC after its purchase. (Transcript, pp. 255, 262). His belief is supported by the second paragraph of the Letter Agreement:

>    Your intent is to form a limited liability company, under the name "Internet Depot, LLC", in which you are the sole member (i.e., owner). A lease will be secured for the Center's location, under the LLC's name. An agreement will be entered into between Internet Depot LLC and World Touch Gaming, which will secure the software necessary to run World Touch Gaming's sweepstakes software at the Center, as well as

11

the purchase of computer equipment and related materials for the operation of the Center.

(Plaintiff's Exhibit 6). Based on this provision, it appears that the parties intended for all contracts and property associated with the Center to be acquired in the name of Internet Depot, LLC, and not in Segundo's name.

The Letter Agreement also provided, of course, that Segundo "will be entitled to file with appropriate governmental agencies any documents necessary to preserve a lien upon all equipment, fixtures, and assets of the Center," and that labels would be placed on the equipment reflecting Segundo as its owner. (Plaintiff's Exhibit 6).

Galaz testified that Segundo's security interest in the Center's equipment was created by two documents: the Letter Agreement dated October 11, 2007, and the financing statement dated February 18, 2008. (Transcript, p. 118). According to the Debtor, however, he was advised and believed that no valid security agreement was ever signed, that the financing statement was deficient, and that Segundo's security interest in the Center's property was invalid. (Transcript, pp. 254, 345).

The evidence does not establish that Segundo was the owner of the Center's equipment, or that the Debtor believed that Segundo held a valid security interest in the equipment after it was retrieved from the Sheriff's Department. For purposes of embezzlement under §523(a)(4) of the Bankruptcy Code, therefore, the Court finds that the Debtor did not appropriate property of Segundo with the intent to defraud Segundo.

**C. Section 523(a)(6)**

Count III of the Second Amended Complaint is based on §523(a)(6) of the Bankruptcy Code. Section 523(a)(6) provides:

12

**11 U.S.C. §523. Exceptions to discharge**

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. §523(a)(6). "The established law is clear that a debtor must commit some type of intentional tort directed against the claimant or his property in order for a court to find that the resulting damages are nondischargeable." In re Nofziger, 361 B.R. 236, 243 (Bankr. M.D. Fla. 2006). For nondischargeability under §523(a)(6), the injury must be both willful, meaning that the injury itself was intended, and malicious, meaning that the debtor was conscious of his wrongdoing. In re Luca, 422 B.R. 772, 775 (Bankr. M.D. Fla. 2010).

In this case, the Plaintiff asserts that the Debtor willfully and maliciously injured Segundo by depriving it of the sum of $130,000.00, converting the Center's equipment for his personal advantage after the equipment was to be liquidated, using the Center's equipment in a way that would diminish its value, and failing to comply with the Letter Agreement. (Doc. 257, p. 2).

The evidence shows that the Debtor knew that he damaged Segundo's right to recover its loan when he removed the Center's assets from Hillsborough County to Jacksonville, Florida, and used the assets in a new business created with a new business partner. In other words, the Debtor knew that Segundo was contractually entitled to repayment of its loan from the liquidation of the Center's equipment, but used the equipment in connection with a newly-formed business without Segundo's knowledge or permission.

The evidence showing the intentional injury by the Debtor to Segundo includes the following:

13

1. On October 11, 2007, the Debtor signed the Letter Agreement, which provided for Segundo to loan the sum of $130,000.00 to the Debtor for the start-up of the Center. The Letter Agreement also provided that "all material assets will be liquidated and first used to pay back any unrecouped portion of the loan" in the event the Center is not profitable or the parties agree to terminate the Center's operation. (Plaintiff's Exhibit 6).

2. On May 15, 2008, the Debtor received a proposed lien agreement from Segundo, and understood that the document was intended to memorialize Segundo's right to be paid from the Center's property under the Letter Agreement. (Plaintiff's Exhibit 24; Transcript, pp. 245).

3. On August 28, 2008, the Debtor received a letter from Segundo, in which Segundo asserted that the Center was not profitable, and that "all material assets must now be liquidated in order to pay back the unrecouped portion of the loan" in the amount of $130,000.00. (Plaintiff's Exhibit 35; Transcript, pp. 250-51).

4. On October 6, 2008, Galaz sent the Debtor an email stating that the Letter Agreement "entitled Segundo Suenos to receive and liquidate the remaining equipment." (Plaintiff's Exhibit 42).

5. On October 29, 2008, the Articles of Organization for Southern Investments of Jacksonville LLC were filed with the Secretary of State. Matthew Baum was listed as the managing member of the company. (Plaintiff's Exhibit 44).

6. On November 13, 2008, the Debtor and Matthew Baum signed a Joint Venture Agreement. According to the Agreement, the purpose of the venture was to "carry on the business of operating sweepstakes games" in Jacksonville, using the Southern Investments name, with the Debtor as the day-to-day manager of the business. (Plaintiff's Exhibit 68; Transcript, p. 260).

7. On December 28, 2008, the Debtor signed a Computer Lease Agreement. Pursuant to the Lease Agreement, the Debtor leased certain computer equipment to Southern Investments of Jacksonville, LLC. (Plaintiff's Exhibit 68). The computers leased to Southern Investments were the computers from Internet Depot (the Center). (Transcript, p. 261).

8. The Debtor did not inform Segundo that he was opening a business in Jacksonville using the Center's equipment, or receive Segundo's permission to relocate the equipment. (Transcript, pp. 292, 327-29).

9. Southern Investment's business opened in Jacksonville in February of 2009 using at least a portion of the Center's computer equipment. (Transcript, pp. 261-62).

In other words, the evidence shows that (1) the Debtor received a $130,000.00 personal loan from Segundo to open the Center; (2) the Debtor agreed to liquidate the Center's assets to repay Segundo if the Center was not profitable; (3) the Debtor knew that Segundo intended to enforce its right to repayment of the loan from the Center's assets; (4) within two months after Segundo asserted its right to repayment from the Center's assets, the Debtor entered into an agreement with a new partner to open an internet center in a different location using the Center's assets; and (5) the Debtor actually opened the new business without notifying Segundo that the Center's equipment had been relocated.

In this litigation, the Debtor has admitted that the Letter Agreement provided Segundo with the right to acquire a security interest in the Center's equipment. (Doc. 69, p. 3; Transcript, p. 345). The Debtor had consented to the provision in the Letter Agreement that entitled Segundo to repayment of its loan from the liquidation of the Center's assets, and knew that Segundo claimed an interest in the Center's equipment under the Letter Agreement. Even though he had agreed to the arrangement, however, the Debtor relocated the equipment to another county and used it in a newly-formed business without Segundo's knowledge or permission. (Transcript, pp. 324-29).

Although §523(a)(6) requires an intentional tort, it is not limited to claims based on an injury to a secured creditor's collateral. See, for example, In re Garcia, 442 B.R. 848 (Bankr. M.D. Fla. 2011), in which the Court found that the debtor's actions harmed the plaintiff's right to repayment of its loan, even though the plaintiff had not properly perfected its mortgage:

> Whether the mortgage was perfected, however, makes no difference to the Court's analysis; Fidelity's tardiness in perfecting its mortgage has no bearing on whether Garcia's action harmed Fidelity or its right to seek repayment of the loan by foreclosing upon the home.

15

In re Garcia, 442 B.R. at 852. See also In re Jennings, 670 F.3d 1329, 1333-34 (11th Cir. 2012)(The plaintiff established a cause of action under §523(a)(6), because the debtor had allegedly damaged the plaintiff's right to collect on a personal injury judgment.).

Based on the evidence in this case, the Court finds that the Debtor's conduct constitutes a willful and malicious injury to the Plaintiff within the meaning of §523(a)(6) of the Bankruptcy Code. The Debtor injured Segundo's right to recover its loan, the injury was intended, and the Debtor was conscious of his wrongdoing.

The debt owed by the Debtor to the Plaintiff under the Letter Agreement is not dischargeable in the Debtor's Chapter 7 case, because it is a debt for a willful and malicious injury under §523(a)(6) of the Bankruptcy Code.

### D. Amount of nondischargeable debt

The Court has determined that the debt owed by the Debtor under the Letter Agreement is not dischargeable in the Debtor's bankruptcy case pursuant to §523(a)(6) of the Bankruptcy Code. The final question, therefore, involves a determination of the amount of the debt that should be deemed nondischargeable.

In cases in which the nondischargeability of a debt under §523(a)(6) is based on the debtor's conversion of a creditor's collateral, a number of Courts find that the amount of the injury is the fair market value of the property at the time of the conversion. In re Cone, 2009 WL 1089463, at 5 (Bankr. S.D. Fla.).

In this case, however, the determination of nondischargeability is not based on a conversion of Segundo's property. Instead, the determination is based on the Debtor's willful and malicious injury to Segundo's contractual right to repayment of its $130,000.00 loan from the Center's assets. The Court

16

finds that the amount of the nondischargeable debt is the original loan amount of $130,000.00, less the value of the equipment that was returned to Segundo in 2010. The Court reaches this conclusion for two primary reasons.

First, the determination is consistent with the purpose of §523(a) to prevent a debtor from avoiding the consequences of his wrongful conduct. See In re Ellison, 296 B.R. at 271-72. The policy particularly applies where the injuries to the creditor were willful and malicious within the meaning of §523(a)(6).

> This Court now holds that when a judgment debt is deemed to have arisen from willful and malicious conduct on the part of a debtor, the entire judgment debt, including both compensatory and punitive damages, is nondischargeable under §523(a)(6). This Court is persuaded that the language of §523(a)(6) provides for the nondischargeability of *all debts* arising from a debtor's willful and malicious act which causes injury to the person or property of another. In addition, this Court finds that excepting punitive damages from discharge under §523(a)(6) is not inconsistent with the Bankruptcy Code's "fresh start" policy because §523 of the Bankruptcy Code sets forth explicit exceptions to that policy.

In re McGuffey, 145 B.R. 582, 596 (Bankr. N.D. Ill. 1992)(Emphasis in original). See also In re Tanner, 1997 WL 578746, at 4, n.3 (Bankr. N.D. Ill.)(Punitive damages may be nondischargeable under §523(a)(6), because the "very purpose" of §523(a)(6) is for the debtor to remain accountable if he has acted willfully and maliciously against another entity.).

Second, the Debtor stipulated in a separate state court action that the amount of the damages for his failure to return the equipment to Segundo was $130,000.00.

Specifically, on June 16, 2009, the Debtor signed a document entitled Rule 11 Agreement in a Texas state court action filed by Segundo. (Plaintiff's Exhibit 58). In the document, the Debtor agreed (1) to produce the Center's equipment, or furnish an explanation of the equipment's disposition or location, by July 30, 2009, and (2) to use his best efforts to obtain an affidavit from Southern

17

Investments that none of the Center's equipment was being used by Southern Investments in its business. The Rule 11 Agreement also includes the following clause:

Remedy for failure: Judgment for full amount of the claim: $130,000.

The Debtor's signature appears immediately below the stipulated remedy on page 2 of the Rule 11 Agreement. The Debtor did not fulfill the terms of the agreement or produce the equipment on July 30, 2009, and filed his bankruptcy case one month later on August 31, 2009.

The purpose of §523(a)(6) is to hold debtors accountable for their wrongful conduct, and the Debtor in this case has stipulated that the appropriate remedy for his failure to return the equipment to Segundo is $130,000.00. Accordingly, the Court finds that the base amount of the nondischargeable debt owed by the Debtor to the Plaintiff is the original loan amount of $130,000.00.

On August 11, 2010, however, during the course of the Chapter 7 case, the Court entered an Order Granting Debtor's Motion for Turnover. (Main Case, Doc. 55). The Order directed the Debtor to deliver the Center's equipment to Segundo within twenty days of the date of the Order.

According to an appraisal obtained by the Debtor, the value of the equipment as of the "effective date" of August 1, 2009, was $12,050.00. (Main Case, Doc. 37, Exhibit A). Consequently, the Debtor should receive a credit for the appraised value of the equipment that was returned to Segundo after his bankruptcy case was filed.

For these reasons, the amount of the nondischargeable debt is the original loan amount of $130,000.00, less the sum of $12,050.00 representing the value of the equipment returned to Segundo, for a final nondischargeable debt under §523(a)(6) of the Bankruptcy Code in the amount of $117,950.00.

## Conclusion

In 2007, the Debtor entered into a Letter Agreement with Segundo Suenos, LLC for the start-up and operation of an internet center (the Center). The Center was funded with a loan from Segundo to the Debtor in the amount of $130,000.00, and the Center opened for business in February of 2008. Approximately two months later, in April of 2008, the Sheriff's Department closed the Center and seized its assets. The assets ultimately were returned to the Debtor pursuant to a settlement with the Sheriff's Office.

In his Second Amended Complaint, the Plaintiff asserts that the debt arising from the loan is nondischargeable in the Debtor's Chapter 7 case pursuant to §523(a)(2), §523(a)(4), and §523(a)(6) of the Bankruptcy Code.

A fundamental purpose of the Bankruptcy Code is to afford financial relief to honest but unfortunate debtors. The exceptions to discharge provided by §523(a), however, are intended to prevent a debtor from avoiding the consequences of his wrongful conduct by filing a bankruptcy case.

In this case, the debt owed to the Plaintiff is not nondischargeable under §523(a)(2) for fraud, because the evidence does not show that the Debtor intended to deceive Segundo at the time that he obtained the loan. Further, the debt is not nondischargeable under §523(a)(4) for embezzlement, because the evidence does not show that the Debtor appropriated property of Segundo with fraudulent intent.

The debt is nondischargeable under §523(a)(6) for "willful and malicious injury," however, because the evidence establishes that the Debtor knew that he damaged the Plaintiff's right to recover the loan when he removed the Center's equipment to another county and used it in a new business without Segundo's knowledge or permission.

19

Accordingly:

**IT IS ORDERED** that:

1. The debt owed by the Debtor, Jon Philip Monson, II, to the Plaintiff, Alfred Galaz, is not nondischargeable pursuant to §523(a)(2) or §523(a)(4) of the Bankruptcy Code.

2. The debt owed by the Debtor, Jon Philip Monson, II, to the Plaintiff, Alfred Galaz, in the amount of $117,950.00 is nondischargeable in the Debtor's Chapter 7 case pursuant to §523(a)(6) of the Bankruptcy Code.

3. A separate Final Judgment will be entered consistent with this Opinion.

**DATED** this 9th day of January, 2015.

**BY THE COURT**

PAUL M. GLENN
United States Bankruptcy Judge